**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| NAVIENT SOLUTIONS, LLC, *et al.*,<br><br>               Plaintiff,<br>   v.<br><br>THE UNITED STATES,<br><br>               Defendant. | Nos. 18-1679C (consolidated)<br><br>Judge Thomas C. Wheeler |

**PLAINTIFF CONTINENTAL SERVICE GROUP, INC.'S OPPOSITION TO THE
GOVERNMENT'S MOTION TO DISMISS AND REQUEST FOR AN EXPEDITED
STATUS CONFERENCE**

<u>Of Counsel:</u>

Richard B. Oliver
J. Matthew Carter
Aaron S. Ralph
Kevin Massoudi
**PILLSBURY WINTHROP
SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
(213) 488-7100
(213) 629-1033 (fax)
richard.oliver@pillsburylaw.com
matt.carter@pillsburylaw.com
aaron.ralph@pillsburylaw.com
kevin.massoudi@pillsburylaw.com

Alexander B. Ginsberg
**PILLSBURY WINTHROP
SHAW PITTMAN LLP**
1650 Tysons Boulevard, 14th Floor
McLean, VA 22102-4856
(703) 770-7521
(703) 770-7901 (fax)
alexander.ginsberg@pillsburylaw.com

Todd J. Canni
**PILLSBURY WINTHROP
SHAW PITTMAN LLP**
725 South Figueroa Street, Suite 2800
Los Angeles, CA 90017-5406
(213) 488-7213
(213) 629-1033 (fax)
todd.canni@pillsburylaw.com

*Attorney of Record for Continental Service
Group, Inc.*

## TABLE OF CONTENTS

Page

I.  SUMMARY ........................................................................................................... 1

II. STATEMENT OF FACTS ..................................................................................... 6

    A. ED Issues New Solicitations Which Attempt to Consolidate Historically
       Separately Procured Services ............................................................................. 6

        1.  New Business Process Operations Solicitation ........................................... 7

III. STANDARD OF REVIEW .................................................................................... 9

IV. ARGUMENT ......................................................................................................... 10

    A. The New Business Process Operations Solicitation Improperly
       Consolidates Default Recovery, Loan Servicing, and Other Back Office
       Services in Violation of CICA ............................................................................ 10

    B. ED's Improper Consolidation of Default Recovery Services and Loan
       Servicing Has Created an Unmitigable Organizational Conflict of Interest
       for Any Winning Team ........................................................................................ 14

    C. ED's Corrective Actions Have Resulted in an Improper *De Facto*
       Cancellation of the Default Collection Procurement ....................................... 16

    D. ConServe Requests Bid and Proposal Costs and Legal Fees ............................ 17

V.  CONCLUSION AND RELIEF REQUESTED .................................................... 18

# TABLE OF AUTHORITIES

Page(s)

Cases

*2B Brokers, et al.*,
   B-298561, 2006 CPD ¶ 178 (Comp. Gen. Nov. 27, 2006) .................................................. 12

*Aegis Techs. Grp., Inc. v. United States*,
   128 Fed. Cl. 561 (2016) .................................................................................................... 14

*Better Serv.*,
   B-265751, 96-1 CPD ¶ 90 (Comp. Gen. Jan. 18, 1996) ............................................ 12, 14

*Brookfield Relocation Inc. v. United States*,
   113 Fed. Cl. 74 (2013) ...................................................................................................... 10

C2C Innovative Solutions, Inc.,
   B-416289 et al., 2018 CPD ¶ 269, (Comp. Gen. July 30, 2018) ......................................... 15

*Chapman Law Firm v. Greenleaf Constr. Co.*,
   490 F.3d 934 (Fed. Cir. 2007).......................................................................................... 10

*Charles H. Tompkins Co. v. United States*,
   43 Fed.Cl. 716 (1999) ...................................................................................................... 11

*CW Gov't Travel, Inc. v. United States*,
   46 Fed.Cl. 554 (2000) ........................................................................................................ 9

*EDP Enters., Inc.*,
   B-284533.6, 2003 CPD ¶ 93, (Comp. Gen. May 19, 2003) ......................................... 11, 13

*FMS Investment Corp. v. United States*,
   138 Fed. Cl. 152 (2018) ...................................................................................................... 9

*FMS Investment Corp. v. United States*,
   139 Fed. Cl. 221 (2018) .......................................................................................... 5, 16, 17

*FMS Investment Corp. v. United States*,
   139 Fed. Cl. 439 (2018) .................................................................................................... 17

*Nat'l Customer Eng'g*,
   B–251135, 93–1 CPD ¶ 225 (Comp. Gen. Mar. 11, 1993) ......................................... 12, 13

*Sigmatech, Inc. v. United States*,
   No. 18-1425C, 2018 WL 6920166 (Fed. Cl. Nov. 30, 2018) .............................................. 15

*Turner Const. Co., Inc. v. U.S.*,
   94 Fed. Cl. 561 (2010) ...................................................................................................... 15

*Vantex Serv. Corp.*,
    B–290415, 2002 CPD ¶ 131 (Comp. Gen. Aug. 8, 2002) ................................... 11, 12, 13, 14

## Statutes and Codes

CICA ......................................................................................................................... passim

Competition in Contracting Act ..................................................................................... 2, 12, 14

United States Code
    Title 31, sections 3718(d)-(e) ................................................................................... 15

United States Code
    Title 41, section 107 ................................................................................................ 11

United States Code
    Title 41, section 3301 .......................................................................................... 1, 2, 11

## Other Authorities

H.R. Rep.
    No. 115-862 ............................................................................................................ 15

**<u>PLAINTIFF CONTINENTAL SERVICE GROUP, INC.'S OPPOSITION TO THE
GOVERNMENT'S MOTION TO DISMISS AND REQUEST FOR AN EXPEDITED
STATUS CONFERENCE</u>**

Plaintiff Continental Service Group, Inc. ("Plaintiff" or "ConServe"), through its

undersigned attorneys, files this timely Opposition to the U.S. Department of Education's ("ED"

or "the Agency") Motion to Dismiss dated January 16, 2019.

The seriousness of these issues and the severe impact they will have on ConServe and its

employees cannot be overstated.  Despite ED's claim that its "corrective actions" have mooted

ConServe's bid protest, ConServe, as a practical matter, remains sidelined from competing to

provide ED with default recovery services – the exact injury complained of when the protest was

filed – and requiring ConServe to find and team with a suitable and complimentary partner even

to be able to compete to provide the solicited consolidated services, which include default

recovery services, erects an unreasonable and unnecessary obstacle to competition in violation of

the Competition in Contracting Act ("CICA").  See 41 U.S.C. § 3301; FAR Subpart 6.1.  As

described below, ED's "corrective actions" do not moot ConServe's protest and, thus, ED's

Motion should be dismissed.

Due to the time sensitivity of the issues raised herein, including the need for ConServe

and the other consolidated plaintiffs to decide whether to file new pre-award protests

imminently, ConServe respectfully requests that the Court expedite the holding of a status

conference.

**I.      SUMMARY**

In its Protest, ConServe challenged ED's attempt to procure debt collection services for

defaulted student loans ("default recovery services") through Next Generation Financial Services

Environment Procurement ("NextGen Procurement") Phase II Solicitation No. 910031-18-R-

0024 - "Business Process Operations," which was previously known as Components E and F in

the Phase I Solicitation.  ConServe explained that ED's efforts to shoehorn in default recovery services into the NextGen Procurement *after* the Phase I Solicitation was issued and proposals were due improperly and unfairly sidelined ConServe and the other Private Collection Agency ("PCA") protesters from the competition in violation of the CICA.  *See* 41 U.S.C. § 3301; FAR Subpart 6.1.  ConServe *sought merely a fair opportunity to compete* to provide ED with default recovery services; as discussed herein, *this necessarily included the opportunity to compete using its own capabilities, excellent past performance and without the imposition of unreasonable obstacles requiring it to secure an equal teaming partner*.

At a hearing on December 4, 2018, this Court commented that protesters had made a convincing argument that they had been excluded from the NextGen Procurement in a seemingly "blatant violation" of CICA.  Dec. 4, 2018 Hearing Transcript 33:11-12; 37:2-3.  The Court asked ED whether it would voluntarily take corrective actions to afford ConServe and the other protesters the relief they requested – the opportunity to compete.  *Id.* at 33-34.  Shortly after the hearing, on December 14, 2018, ED represented to the Court that it would take corrective actions that "will render the consolidated plaintiffs' claims moot because it *provides the consolidated plaintiffs with the relief they seek*:  *a fresh opportunity to participate in the solicitation* for support across the student aid lifecycle covered by NextGen components C, D, E, and F."  Dkt. No. 66 at 1 (emphasis added).

At a separate hearing held on December 21, 2018, ConServe, through counsel, suggested to the Court that ED give the protesters the opportunity to review and comment on a draft solicitation before it was released *out of concern* that ED, again, would implement measures that would address one protest while creating another; specifically, *ConServe was concerned* that ED would attempt to *consolidate or bundle a multitude of services and again sideline ConServe* from participating in its own right to provide such work.  Dec. 21, 2018 Hr'g Tr. 30:1-16.  In

2

response, the Court suggested that protesters meet with ED and try to work this all out, which ConServe expressed a willingness to do, but ED, through counsel, made no similar gesture. *Id.* at 28-30.

In the name of "corrective actions," on January 15, 2019, ED cancelled the component C, D, E, and F solicitations and issued new solicitations. Components E and F are now combined into a ***new single component solicitation*** for Business Process Operations (the "New Business Process Operations Solicitation," Exhibit 1); ***ED did exactly what ConServe expressed concern about at the hearing*** – improperly consolidated services, thereby precluding ConServe from competing to provide default recovery services unless it also could provide other services. Acutely aware that such consolidation again blatantly violates the competition requirements, ED attempts to justify the improper consolidation by allowing offerors to join teams.

Despite ED's position in its Motion to Dismiss, the "corrective actions" do not afford ConServe the relief it sought when it filed its protest and, thus, do not moot its protest. Rather, a plain reading of the New Business Process Operations Solicitation reveals that ED has shifted to a new procurement model that ***improperly consolidates a variety of distinct and independent services***. In doing so, ED has taken one step forward but two steps back. One step forward in that at least now ConServe knows ED's intentions to procure default recovery services, which is an improvement over the last NextGen solicitation. But, unfortunately, two steps backward because ED has erected ***unreasonable obstacles*** requiring ConServe to find suitable partners to team with in order to compete to submit a proposal. In other words, ConServe cannot compete to provide ED with default recovery services work, ***unless*** it can identify and team with other highly qualified and rated firms that can provide all of the various and discrete services. Thus, while ED would like this Court to believe that its corrective actions have addressed and mooted the consolidated protests, the corrective actions merely signal, yet again, ***ED's steadfast***

3

***intention and desire to sideline ConServe*** from competing to provide ED with default recovery services.  Indeed, ED's "corrective actions" have simply erected new barriers to competition that violate CICA and other applicable procurement regulations for a number of reasons.

First, the New Business Process Operations Solicitation improperly consolidates several distinct and independent services from ***default recovery*** (typically performed by PCAs like ConServe) to ***financing*** (application and eligibility, origination and disbursement, and in-school servicing typically performed directly by ED in conjunction with higher education institutions) to a laundry list of other discrete ***in-repayment and back-office post-school processing services*** (typically performed by loan servicers).  In doing so, ED has unreasonably and unnecessarily restricted competition to the offeror that can provide all of those services and/or those teams that can provide all of these services.  As a result, a highly rated PCA like ConServe – who was likely to receive an award for default recovery services work under ED's prior long-standing procurement model – cannot compete to provide default recovery services unless it can identify and team with other highly qualified and rated firms that have financing, loan servicing and other back-office processing capabilities.  ED's proposed "corrective actions" are not reasonable under the circumstances and do not provide ConServe with the relief sought because the new procurement model unreasonably and unnecessarily precludes ConServe from competing on its own to provide default recovery services work in violation of CICA.

Second, by improperly consolidating default recovery services with loan servicing, ED has created an unmitigable organizational conflict of interest ("OCI") for any winning team – an ***OCI that would impair their objectivity***.  Indeed, since default collection agencies and loan servicers are paid using different payment structures and are funded differently, the winning team will have a financial incentive to divert incoming accounts to the service that will provide higher compensation.  As a consequence, the awardee's financial interests may impair the

awardee's judgment and ability to render objective services to the Government and borrower. Thus, since no winning team could reasonably mitigate this inherent OCI, ED's new procurement model actually exacerbates, rather than remedies, the defects in the NextGen Procurement.  The fact that ED has glossed over this serious conflict illustrates how ill-conceived this entire procurement model is and how it is being rushed through seemingly to avoid continuing with a separate procurement for much needed default recovery services.

Third, by formally announcing its intent to procure default recovery services through the NextGen Procurement rather than through the Default Collection Procurement (Solicitation No. ED-FSA-16-R-0009), ED's "corrective actions" have resulted in an improper *de facto* cancellation of the Default Collection Procurement.  Indeed, rather than address the specific litany of concerns identified in this Court's prior decision invalidating ED's cancellation of the Default Collection Procurement, ***ED blatantly has ignored this Court's order*** finding that "ED either did not have, or did not sufficiently document, a rational basis for its decision to cancel" the Default Collection Procurement and continued to go on with business as usual as if this Court did not specifically enjoin the Agency from cancelling that procurement.  *FMS Investment Corp. v. United States,* 139 Fed. Cl. 221, 223-225 (2018) (noting that the administrative record relied upon by ED was "scant," that it appeared "slipshod," and that ED's new program to procure default recovery services "still needs to be reviewed for compliance with applicable laws and regulations").  ED's failure to explain itself is particularly problematic in light of the fact that the New Business Process Operations Solicitation's restrictions on competition will effectively sideline ConServe from competing for work under the NextGen Procurement.  Collectively, the restrictions in the New Business Process Operations Solicitation and the *de facto* cancellation of the Default Collection Procurement will unreasonably and irrationally shut ConServe out from ***any*** competition for default recovery services.  ConServe further requests that, in light of ED's

5

blatant actions in violation of this Court's order, that the Court award it its bid and proposal preparation costs and attorney fees associated with the Default Collection Procurement as well as any other relief this court deems appropriate.

In sum, while ConServe takes no enjoyment in challenging each flawed decision made by ED – an experience we liken to "whack-a-mole," if it must to protect its significant investment and the jobs of its valued employees, it will continue to do so.  ConServe filed its Protest to ensure that it had a ***fair opportunity to compete*** for default recovery services under the NextGen Procurement.  The "corrective actions" taken by ED do not remedy that defect.  Instead, ED's corrective actions have created new and unreasonable obstacles to competition for those services in violation of CICA and other applicable procurement laws and regulations.  Accordingly, ConServe respectfully requests that this Court deny the Motion to Dismiss finding that ED's "corrective actions" do not afford ConServe the relief requested and, thus, do not moot its protest.

## II.      STATEMENT OF FACTS

The long history and facts relevant to ConServe's Protest are set forth in its Complaint and are incorporated herein.  The facts pertinent to this Opposition are summarized below.

### A.      ED Issues New Solicitations Which Attempt to Consolidate Historically Separately Procured Services

On January 15, 2019, ED issued two new solicitations through the Federal Business Opportunities website: the New Business Process Operations Solicitation (No. 910031-19-R-0008) and the New Enhanced Processing Solution Solicitation (No. 910031-19-R-0005).  Because the New Business Process Operations Solicitation incorporates default recovery services, we focus on this solicitation.

### 1.    New Business Process Operations Solicitation

The New Business Process Operations Solicitation will support operations "across the entire life cycle of student financing (from application for financing, to origination and disbursement, to processing and servicing and pay-off or ***default***)." Ex. 1, New Business Process Operations Solicitation at 3 (emphasis added).  The solicitation describes the "life cycle of student financing" and the current structure of ED's student loan processing:

> At the beginning of the life cycle, customers apply for federal financing via the Free Application for Federal Student Aid ("FAFSA"). FSA uses this information to calculate eligibility for federal student loans. For eligible customers, FSA then originates and disburses loans, primarily through higher educational institutions, to FSA customers.
>
> ***Once customers enter repayment, customer loans are currently assigned to one of nine servicers, which perform a complete set of Federal student loan servicing activities*** including: customer service; loan counseling; loan consolidation; billing and payment application and processing; repayment plan adjustments and application of benefits such as deferments, forbearance, or loan forgiveness/discharge; outreach and default aversion; quality control; and financial and other data reporting. Each of the nine servicers operates its own engagement layer with proprietary branding (e.g., websites, tools, contact centers), utilizes one of four servicing platforms, and maintains certain additional technical systems (e.g., identity and access management solutions). Individual customers may have several loans on different repayment plans and may be enrolled in specialty programs (e.g., Public Service Loan Forgiveness ("PSLF"), Total and Permanent Disability Discharge ("TPD'), Teacher Education Assistance for College and Higher Education Grants ("TEACH"), Federal Perkins Loans ("Perkins"), Pell Grant overpayments ("Pell")).
>
> ***For customers who fail to pay their loans, currently FSA and private collection agencies share Federal default recovery activities***. Once a loan defaults, FSA transfers the loan to a default management and collection system (DMCS) and attempts to bring the loan back to good standing. If unsuccessful, collections activity is turned over to one of a group of contracted third-party Private Collection Agencies (PCAs) that pursue default resolution. Customers may rehabilitate a defaulted loan by making a series of payments or consolidating their loans out of default. This process

> often results in rehabilitated borrowers being handed off multiple
> times between DMCS/PCAs and the servicers.

*Id.* at 3-4 (emphasis added).

ED's stated goal with the New Business Process Operations Solicitation is to "procure an enterprise-wide, FSA-branded omni-channel digital platform featuring a mobile-first, mobile-complete, and mobile-continuous solution." *Id.* at 5. The solicitation states that this "digital platform **will consolidate the functionalities** of the multiple websites, mobile applications, and contact centers **that currently exist across the full customer lifecycles (*from application to school to servicing to default*)**." *Id.* at 5-6 (emphasis added). ED then describes the litany of disparate services that have been consolidated. *See id.* at 9-10.

Aware that ConServe and other PCAs cannot, on their own, provide these consolidated services, the New Business Process Operations Solicitation advises offerors to use non-exclusive teaming agreements to form a team, or multiple teams, to bid on this procurement:

> Offerors shall not enter into any exclusivity agreements with
> subcontractors. Nothing in the offeror's teaming agreement or
> other arrangement with a proposed subcontractor shall prohibit or
> restrict in any way the ability of the proposed subcontractor from
> pursuing subcontract or teaming arrangements with other offerors
> participating in this competition or from entering in any such
> arrangement. Proposals that include the use of exclusivity
> agreements will be considered by the Government as deficient and
> eliminated from consideration.

*Id.* at 5; *see also* Motion to Dismiss, Dkt. No. 77 at 6 (explaining that "the new solicitations permit offerors to use non-exclusive teaming agreements, giving interested parties the option to join a team, or multiple teams, as the provider of specific services of interest to them").

Importantly, the New Business Process Operations Solicitation also contains express Conflict of Interest provisions, which state:

> (a)(1) The contractor, subcontractor, employee, or consultant, has
> certified that, to the best of its knowledge and belief, there are no

8

relevant facts or circumstances that could give rise to an
***organizational or personal conflict of interest*** (see FAR Subpart
9.5 for organizational conflicts of interest) (or apparent conflict of
interest) for the organization or any of its staff, and that the
contractor, subcontractor, employee, or consultant has disclosed all
such relevant information if such a conflict of interest appears to
exist to a reasonable person with knowledge of the relevant facts
(or if such a person would question the impartiality of the
contractor, subcontractor, employee, or consultant). Conflicts may
arise in the following situations:

> . . .

> (iii) ***Impaired objectivity*** —***A potential contractor,***
> subcontractor, employee, or consultant, or member of their
> immediate family (spouse, parent, or child) ***has financial or***
> ***other interests that would impair, or give the appearance of***
> ***impairing, impartial judgment*** in the evaluation of
> government programs, in offering advice or recommendations
> to the government, or ***in providing*** technical assistance or
> other ***services to recipients of Federal funds as part of its***
> ***contractual responsibility***. . . .

Ex. 1 at 32 (emphases added).

## III.   STANDARD OF REVIEW

In reviewing an agency's claim that a protest is moot, the Court's analysis is substantially
the same as it would be for a motion to dismiss for lack of subject matter jurisdiction under
RCFC 12(b)(1).  *See FMS Investment Corp. v. United States*, 138 Fed. Cl. 152, 156 (2018).
When a defendant files a motion under RCFC 12(b)(1), the Court must "assume all factual
allegations to be true and . . . draw all reasonable inferences in plaintiff's favor." *Id.* (citations
omitted).  A case should only be dismissed as moot "if the issues presented are no longer live or
the parties lack a legally cognizable interest in the outcome." *Id.* (internal quotations and
citations omitted).

Towards this end, this Court has explained that "[t]he parties lack such an interest if the
defendant's alleged act will not recur, and if intervening events have ***completely and irrevocably***

*eradicated the effects of the alleged violation*." *Id.* at 156-157; *see also CW Gov't Travel, Inc. v. United States,* 46 Fed. Cl. 554, 557 (2000). Said another way, a protest should only be dismissed when "corrective action adequately addresse[s] the effects of the challenged action, and the Court of Federal Claims ha[s] no reasonable expectation that the action would recur." *Chapman Law Firm v. Greenleaf Constr. Co.,* 490 F.3d 934, 940 (Fed. Cir. 2007); *see also Brookfield Relocation Inc. v. United States*, 113 Fed. Cl. 74, 79 (2013) (explaining that "[a] defendant cannot ordinarily moot a case or controversy simply by promising to cease the challenged conduct. Instead, a defendant must show that that conduct is not likely to reoccur."). Finally, the Federal Circuit has made clear that "the mere decision to take corrective action does not necessarily moot a bid protest." *Cont'l Serv. Grp., Inc. v. United States*, 722 Fed. Appx. 986, 993 (Fed. Cir. 2018).

Here, ConServe remains sidelined from competing to provide ED with default recovery services – the exact injury complained of when the protest was filed – and requiring ConServe to find and team with a suitable and complimentary partner to be able to compete erects an unreasonable and unnecessary obstacle to competition. As described below, ED's "corrective actions" do not moot ConServe's protest.

## IV.   ARGUMENT

### A.   The New Business Process Operations Solicitation Improperly Consolidates Default Recovery, Loan Servicing, and Other Back Office Services in Violation of CICA

The New Business Process Operations Solicitation improperly consolidates several distinct and independent services from ***default recovery services*** (typically performed by PCAs) to ***financing services*** (application and eligibility, origination and disbursement and in-school servicing typically performed directly by ED in conjunction with higher education institutions) to a host of other ***in-repayment and back-office post-school processing services*** (typically

performed by loan servicers).  As a result, ED has unreasonably and unnecessarily restricted

competition to those firms or teams that can provide ***all*** of these discrete services.

CICA generally requires that solicitations permit full and open competition and contain

restrictive provisions only to the extent necessary to satisfy the procuring agency's needs.  *See* 41

U.S.C. § 3301; FAR Subpart 6.1; C*harles H. Tompkins Co. v. United States*, 43 Fed.Cl. 716, 720

(1999) ("A consequence of this [full and open competition] duty is the requirement that

solicitation provisions which restrict competition be used only to the extent necessary to satisfy

the needs of the agency or as authorized by law.") (internal quotations omitted).  Under CICA,

the term "full and open competition" means that "all responsible sources are permitted to submit

sealed bids or competitive proposals on the procurement."  41 U.S.C. § 107.

And while this Court has not directly addressed an allegation of improper consolidation

outside the small business context, the GAO consistently has recognized that an allegation of

improper consolidation (or bundling) under CICA reflects a claim that ***a contract combines***

***separate requirements beyond what is reasonable and necessary*** to meet the agency's needs,

thereby limiting competition by sidelining offerors that can only perform a portion of the

requirement.[1]  *See, e.g., Vantex Serv. Corp.*, B–290415, Aug. 8, 2002, 2002 CPD ¶ 131 at 4

(sustaining protest where the agency improperly bundled two distinct types of waste removal

services which reduced competition in violation of CICA); *EDP Enters., Inc.*, B-284533.6, May

---

[1] The FAR defines the term "consolidation" as "a solicitation for a single contract . . . to satisfy . . . Two or more requirements of the Federal agency for supplies or services that have been provided to or performed for the Federal agency under two or more separate contracts . . . ." FAR 2.101.  "Bundling," on the other hand, is merely a subset of "consolidation" that combines two or more requirements for supplies or services, previously provided or performed under separate smaller contracts, in a manner that impacts a small business' ability to compete. *Id.*

11

19, 2003, 2003 CPD ¶ 93 (sustaining protest where the agency improperly bundled food services with other logistics support functions which restricted competition in violation of CICA).

With CICA's "full and open competition" mandate in mind, the GAO has consistently held that administrative convenience ***does not*** justify an agency's consolidation (bundling) of disparate requirements:

> The agency's justification, quoted above, essentially amounts to reliance on administrative convenience as the basis for the bundling. However, ***the fact that the agency may find that combining the requirements is more convenient administratively,*** in that it has found dealing with one contract and contractor less burdensome, ***is not a legal basis to justify combining the requirements, if the combining of requirements restricts competition***.

*Vantex Serv. Corp*., *supra*, at 4 (emphases added).

The GAO also has explained that "***CICA and its implementing regulations require that the scales be tipped in favor of ensuring full and open competition***, whenever concerns of economy or efficiency are being weighed against ensuring full and open competition." *Id.; see also Better Serv.*, B-265751, Jan. 18, 1996, 96-1 CPD ¶ 90 ("When concerns of administrative convenience are being weighed against ensuring full and open competition, the Competition in Contracting Act (CICA) . . . and its implementing regulations require that the scales be tipped in favor of ensuring full and open competition.").

Furthermore, allowing teaming does not cure this serious defect. Indeed, the GAO has found unpersuasive an agency's position that the offerors can team to meet the solicitation requirements. Specifically, GAO held that "[t]he fact that the agency expects to receive some competition under the RFP does not relieve an agency of the burden under CICA of justifying restrictions to full and open competition." *2B Brokers, et al*., B-298561, Nov. 27, 2006, 2006 CPD ¶ 178 at 10; *see also Nat'l Customer Eng'g*, B–251135, Mar. 11, 1993, 93–1 CPD ¶ 225 at

6.  "The issue is not whether there are any potential offerors which can surmount barriers to competition by, ***for example, entering into teaming or partnering arrangements as argued by the agency***, but rather whether the barriers themselves--here, bundling--are required to meet the government's needs." *EDP Enters., Inc.,* B-284533.6, May 19, 2003, 2003 CPD ¶ 93 (emphasis added); *see also Vantex Serv. Corp.*, *supra*, at 5; *Nat'l Customer Eng'g*, *supra*, at 5.

Here, ED is attempting to consolidate via the New Business Process Operations Solicitation a number of distinct and independent services – from default recovery to financing to a host of other back-office processing services – that have historically been procured separately or otherwise handled directly by ED.  As a result, a highly rated PCA like ConServe – who was likely to receive an award for default recovery services work under ED's old procurement model – cannot compete for default recovery services work unless it can identify and team with other highly qualified and rated firms that have loan servicing and other back-office processing capabilities.  This new teaming requirement is unreasonable and unnecessarily restricts competition in violation of CICA.

Similar to the GAO's explanation in *EDP Enterprises., Inc.*, the issue here is not whether ConServe or any other potential offeror can form a team to surmount the barriers to competition, but rather whether the barriers themselves – *i.e.*, the improper consolidation of disparate and distinct services – are required to meet the Government's needs.  B-284533.6, May 19, 2003, 2003 CPD ¶ 93 at 8. ***The answer to that question is indisputably "no."***  Indeed, ED has not – and cannot for that matter – provide a reasonable explanation for why the consolidation of these disparate services is necessary to meet the Government's needs, particularly when the consolidation will result in the exclusion of the most qualified and highly rated PCAs from the competition for default recovery services work under the NextGen Procurement.  Nor can ED

reasonably explain why it would wish to sideline highly experienced PCAs like ConServe from competing, which is good for ED and taxpayers.

Moreover, while ED may assert that consolidating all of these disparate services is more convenient administratively to the agency and borrowers, the GAO persuasively has explained that convenience alone "is not a legal basis to justify combining the requirements, if the combining of requirements restricts competition." *Vantex Serv. Corp.*, *supra*, at 4. Indeed, "[w]hen concerns of administrative convenience are being weighed against ensuring full and open competition, the Competition in Contracting Act . . . and its implementing regulations require that the scales be tipped in favor of ensuring full and open competition." *Better Serv.*, B-265751, Jan. 18, 1996, 96-1 CPD ¶ 90.

In short, the New Business Process Operations Solicitation does not address fully the obstacles to competition for PCAs like ConServe who want to compete for default recovery services work under the NextGen Procurement. Rather, it merely replaces the old obstacles with new ones that only allow PCAs like ConServe to compete to provide default recovery services *if* they can identify and team with other highly qualified and rated firms that can provide all of the various and discrete services. For this reason, the cited "corrective actions" do not moot ConServe's protest because ED's actions continue to unnecessarily restrict competition in violation of CICA.

**B.    ED's Improper Consolidation of Default Recovery Services and Loan Servicing Has Created an Unmitigable Organizational Conflict of Interest for Any Winning Team**

Additionally, ED's improper consolidation of default recovery services with loan servicing has created an unmitigable OCI for any winning team that would impair its objectivity.

As this Court has recognized, an underlying principle of the FAR's OCI rules is "[p]reventing the existence of conflicting roles that *might bias a contractor's judgment*." *Aegis*

*Techs. Grp., Inc. v. United States*, 128 Fed. Cl. 561, 575 (2016) (quoting FAR 9.505(a)) (emphasis added). Towards this end, this Court has explained that the "primary concern" of an impaired objectivity OCI is that "a firm might not be able to render impartial advice." *Sigmatech, Inc. v. United States*, No. 18-1425C, 2018 WL 6920166, at *40 (Fed. Cl. Nov. 30, 2018) (internal quotations omitted); *see also Turner Const. Co., Inc. v. U.S., 94 Fed. Cl.* 561, 569 (2010); *C2C Innovative Solutions, Inc.*, B-416289, B-416289.2, July 30, 2018, 2018 CPD ¶ 269 at 8 (stating that "an impaired objectivity OCI exists where a firm's ability to render impartial advice to the government will be undermined by the firm's competing interests, such as a relationship to the product or service being evaluated").

Here, there can be no reasonable dispute that the consolidation of default recovery services with loan servicing under the New Business Process Operations Solicitation has created an unmitigable OCI for any winning team. Indeed, as noted above, default recovery services and loan servicing historically have been procured separately ***and compensated under separate payment regimes with different funding sources***. PCAs performing default recovery services are compensated through a contingency fee that is based upon the amount of money actually recovered from defaulted borrowers, and the fee is derived from the funds collected. *See* 31 U.S.C. §§ 3718(d)-(e). Loan servicers, on the other hand, are paid a set monthly fee per account through Congressional appropriations. *See, e.g.*, H.R. Rep. No. 115-862 at 149 (setting the appropriation amount for "Loan Servicing Activities" in fiscal year 2019 at $980,000,000); H.R. Rep. No. 115-244 at 125 (setting the appropriation amount for "Loan Servicing Activities" in fiscal year 2018 at $1,017,000,000). Thus, under the new procurement model set forth in the New Business Process Operations Solicitation, the winning team will be subject to both payment regimes.

Moreover, the winning team will have a financial incentive to divert incoming accounts and shift resources to the service that will provide higher compensation and/or profits, which may conflict with what is best for the borrowers or the Government.  As a result, this inherent incentive to assign accounts and shift resources to the more profitable components will impair the winning team's objectivity and will affect its ability to render impartial "services to recipients of Federal funds as part of its contractual responsibility."  Ex. 1, New Business Process Operations Solicitation at 32.

Since no winning team could reasonably mitigate this OCI, ED's new procurement model exacerbates, rather than remedies, the defects in the NextGen Procurement.  For this reason, the Court should hold that ED's corrective actions have not mooted the consolidated protests.

C.     **ED's Corrective Actions Have Resulted in an Improper *De Facto* Cancellation of the Default Collection Procurement**

In its September 14, 2018 decision, this Court held that "ED either did not have, or did not sufficiently document, a rational basis for its decision to cancel" the Default Collection Procurement.  *FMS Investment Corp.,* 139 Fed. Cl. at 223.  This Court noted that the administrative record relied upon by ED was "scant," that it appeared "slipshod," and that ED's new program to procure default recovery services "***still needs to be reviewed for compliance with applicable laws and regulations.***"  *Id.* at 225 (emphasis added).  This Court also highlighted additional flaws in ED's attempted cancellation:

> Furthermore, the AR is missing critical information about the enhanced servicer program. The AR does not include any plan or timeline for implementing the program. It does not include a request for proposals, or any mention of what that request might look like. It does not refer to a source of funding. It does not even include a copy of the solicitation that ED cancelled to clear a path for the enhanced servicers.
>
> The AR also lacks thorough estimates of current and future defaulted loan volumes and loan processing capacity. The

16

> cancellation notice assumes that enhanced servicers will begin
> processing loans "in the near future." AR 27. But it sheds no light
> on exactly when the enhanced servicers will begin processing
> loans, or what the enhanced servicers' processing capacity will be
> at any point in the future.

*Id.* For these reasons, the Court enjoined ED from cancelling the Default Collection

Procurement based on the administrative record that it submitted and, in a subsequent Order,

clarified that the protest proceedings had been restored to "the posture of the process before the

illegal cancellation." *Id.* at 227; *FMS Investment Corp. v. United States*, 139 Fed. Cl. 439, 440

(2018).

   Rather than address the specific litany of concerns identified by the Court, ED has

continued to go on with business as usual as if that active procurement simply does not exist.  In

doing so, ED appears to have cancelled the Default Collection Procurement, but yet ED still has

not provided this Court with a "reasoned analysis" for this significant change in the way that ED

procures default recovery services.  *FMS Investment Corp. v. United States,* 139 Fed. Cl. at 226.

   ED's failure to provide this Court with a "reasoned analysis" for its *de facto* cancellation

***reflects a blatant disregard for the Court's order***.  ED's failure to explain itself is particularly

problematic in light of the fact that the New Business Process Operations Solicitation's

restrictions on competition will effectively sideline ConServe from competing for work under the

NextGen Procurement.  Collectively, the restrictions in the New Business Process Operations

Solicitation and the *de facto* cancellation of the Default Collection Procurement will

unreasonably and irrationally shut ConServe out from ***any*** ED competition for default recovery

services.

   **D.    ConServe Requests Bid and Proposal Costs and Legal Fees**

   Lastly, given ED's blatant improper conduct and violation of this Court's Order enjoining

ED from cancelling the Default Collection Procurement, ConServe respectfully requests unique

and extraordinary relief for a large business and asks that the Court award its bid and proposal preparation costs and attorney fees related to the Default Collection Procurement as well as any other relief the Court deems appropriate under these circumstances.

## V.     CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, ConServe respectfully requests that this Court deny ED's Motion to Dismiss declare that ED's corrective actions have not mooted the consolidated protests and award ConServe its bid and proposal preparation costs and attorney fees associated with the Default Collection Procurement.

Due to the time sensitivity of the issues raised herein, including the need for ConServe and the other consolidated plaintiffs to decide whether to file new pre-award protests, ConServe respectfully requests that the Court expedite the holding of a status conference.

Dated: February 7, 2019                                    Respectfully submitted,


Of Counsel:                                               /s/ Todd J. Canni
                                                          Todd J. Canni
Richard B. Oliver                                         **PILLSBURY WINTHROP**
J. Matthew Carter                                         **SHAW PITTMAN LLP**
Aaron S. Ralph                                            725 South Figueroa Street, Suite 2800
Kevin Massoudi                                            Los Angeles, CA 90017-5406
**PILLSBURY WINTHROP**                                    (213) 488-7213
**SHAW PITTMAN LLP**                                      (213) 629-1033 (fax)
725 South Figueroa Street, Suite 2800                     todd.canni@pillsburylaw.com
Los Angeles, CA 90017-5406
(213) 488-7100                                            *Attorney of Record for Continental Service*
(213) 629-1033 (fax)                                      *Group, Inc.*
richard.oliver@pillsburylaw.com
matt.carter@pillsburylaw.com
aaron.ralph@pillsburylaw.com
kevin.massoudi@pillsburylaw.com

Alexander B. Ginsberg
**PILLSBURY WINTHROP**
**SHAW PITTMAN LLP**

18

1650 Tysons Boulevard, 14th Floor
McLean, VA 22102-4856
(703) 770-7521
(703) 770-7901 (fax)
alexander.ginsberg@pillsburylaw.com

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed electronically via the

CM/ECF system.  A true and correct copy was also served by email to the following party, this

7th day of February 2019:

> David Richard Pehlke
> U.S. Department of Justice - Civil Division (G)
> Post Office Box 480
> Ben Franklin Station
> Washington, DC 20044
> (202) 307-0252
> Fax: (202) 353-0461
> Email: david.r.pehlke@usdoj.gov

> /s/ Todd J. Canni
> Todd J. Canni

20